Filed 2/14/25  In re Adrian M. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ADRIAN M., III et al., Persons Coming Under the Juvenile Court Law. | B338331 (Los Angeles County Super. Ct. No. 21CCJP00038BC) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ADRIAN M., JR., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Jesse Frederic Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant Adrian M., Jr.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Adrian M., Jr. (Adrian) appeals from orders under Welfare and Institutions Code section 366.26 terminating his parental rights to his children, Adrian M., III (Adrian III) and Alana M.[1] Adrian argues the juvenile court erred in ruling the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i), did not apply. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Juvenile Court Declares Adrian III and Alana Dependent Children of the Court, and the Department Reports on the Children's Placement and Visits with Adrian*

In January 2021 the Los Angeles County Department of Children and Family Services filed a petition under section 300 on behalf of three-year-old Adrian III, 18-month-old Alana, and their half sibling (who is not Adrian's child or at issue in this appeal). The Department alleged emergency medical services found Adrian III on the floor of the backseat of Adrian's car following an accident where Adrian drove his car into a pole. The Department alleged (1) Adrian endangered Adrian III and placed

---

[1] Statutory references are to the Welfare and Institutions Code.

2

him at risk of serious physical harm by failing to use an appropriate child restraint seat in his car; (2) Adrian's history of substance abuse and current use of controlled substances endangered the children's physical health and safety and placed them at risk of serious physical harm, and the children's mother, Valarie G., failed to protect the children when she knew Adrian was abusing substances and allowed Adrian to reside with, and have unlimited access to, them; and (3) Valarie's history of substance abuse and current use of marijuana and methamphetamine endangered the children's physical health and safety and placed them at risk of serious physical harm, and Adrian failed to protect the children when he knew Valarie was abusing substances and allowed Valarie to reside with, and have unlimited access to, the children.  The court detained the children and placed them with their maternal grandmother, Cynthia H. The court ordered triweekly, three-hour minimum, monitored visitation for Adrian and Valarie.  The children remained placed with Cynthia and subject to the same visitation order throughout the dependency proceedings.

In March 2021 the juvenile court sustained the petition as alleged, declared Adrian III and Alana dependent children of the court, and ordered reunification services.  For the two months after the Department filed the petition, the Department reported Adrian visited the children to the extent permitted by the court.

During the six-month review period Adrian maintained "quality monitored visitation with the children" and helped Cynthia "clothe, bathe, feed, and play with the children."  The court found Adrian made substantial progress with his case plan. In early October 2021, however, Cynthia told the Department that Adrian and Valarie were "no longer welcomed in her home"

after Cynthia discovered money missing following a visit from Adrian and Valarie. The children's paternal grandfather agreed to monitor future visits, but Adrian never contacted him to take advantage of the opportunity. Cynthia said Adrian did not call or visit the children for two months until December 2021, when Adrian asked to visit the children before he had to surrender to begin serving a prison term.

Adrian was incarcerated from December 2021 until January 2023. At the 12-month review hearing in April 2022 the court found Adrian had not made substantial progress with his case plan. Cynthia reported Adrian had no contact with the children in January or February 2022. At the time of the permanency review hearing in December 2022 Adrian remained incarcerated, and the Department reported "[t]he children have not had contact with their father during this period of supervision." The court found Adrian's progress with his case plan was not substantial, terminated reunification services, and set a hearing under section 366.26

In April 2023 Adrian filed petitions under section 388 (later denied) asking the court to reinstate reunification services. In support of his petitions Adrian asserted he had maintained "weekly visitation" with the children since his release from prison in January 2023. Cynthia's statement to the Department confirmed Adrian visited the children every Saturday for six to eight hours and used a video chat application to visit with them at other times. As of April 27, 2023, however, Adrian was again in custody for violating the terms of his probation. He remained in custody until November 2023.

In a June 2023 status review report the Department stated the children had developed a "strong bond" with each other and

4

Cynthia and that they turned to Cynthia for affection, support, and assistance when needed.  The Department also said Cynthia continued to provide the children a "safe and stable environment," as well as the basic necessities of life.  During visits with Adrian before his incarceration in April 2023, Cynthia reported that Adrian engaged with the children, that the children benefited from his visits, and that the children were "sad" when the visits ended.  Cynthia also said she had to "redirect" the children to their parents for assistance during visits.

In August 2023 the Department reported that the children were "extremely bonded" to Cynthia, that she was "protective of the children and their well-being," and that she wanted "to support them as they grow."  Cynthia told a case social worker that she "could not imagine her life without the children" and that she was willing to adopt them (and their half sibling).  Cynthia reported Adrian called from prison "on a regular basis."  Adrian was released from custody in November 2023.

In March 2024 Adrian again filed petitions under section 388 (later denied) asking the court to reinstate reunification services, and he again stated he had maintained weekly visitation with the children since his release from his most recent incarceration.  In the Department's May 2024 report the Department stated both Adrian III and Alana told a case social worker they wanted to live with Cynthia.  Adrian III said that he "loves visiting with his dad," but that he wanted to live with his grandmother.  At the time, Adrian was visiting the children Friday, Saturday, and Sunday for three to four hours each visit.  The case social worker found the children were "closely bonded" with Cynthia, who was willing and able to provide a permanent home for them and committed to adoption.

The report stated that Adrian's time in prison had affected his children's ability to trust Adrian "to be there for them emotionally [and] physically" and that Adrian's incarceration and drug use caused him to be "absent more than present in their lives."  Cynthia expressed concerns Adrian made "poor decisions that might put the children at danger in the future."

Also in May 2024 the Department reported Cynthia continued to provide "excellent care of the children," who "demonstrate[d] a healthy, loving bond" with her.  The Department also reported the children had "stabilized" in Cynthia's home and had "predictable routines that support their wellbeing."

B.    *The Juvenile Court Terminates Adrian's Parental Rights*

At the June 2024 selection and implementation hearing under section 366.26 Adrian testified he was visiting the children every weekend for nine or 10 hours.  Adrian said that the children call him "Daddy" and that they "light up" when they see him and get "extremely happy."  Adrian said that during visits he took the children to the park, read to them, and did puzzles.  Adrian said he also cooked breakfast, helped the children with homework if they had any, and helped them bathe and go to bed.  At the end of visits, Adrian said, the children cried.  Adrian stated that, during both his periods of incarceration, he called the children every other day.  He said he could not have visits with the children while incarcerated because the prison was "too far."

Counsel for Adrian argued the parental-benefit exception to adoption applied because Adrian visited the children as consistently as possible, he had a substantial bond with them,

6

and terminating his parental rights would be detrimental to the children in that "he would not have any legally enforceable way to maintain his presence in their lives." Regarding visitation, counsel for Adrian argued that "visitations were not under [Adrian's] control" when he was incarcerated and that no one was able to take the children "hundreds of miles" to visit Adrian. Counsel for Adrian stressed Adrian "immediately" visited the children upon his release. "It was his incarceration," counsel for Adrian argued, "that prevented [Adrian] from doing it to the fullest extent that he wanted."

Counsel for the children argued the parental-benefit exception did not apply because Adrian's "inconsistent" visitation throughout the case prevented the children from developing a positive emotional attachment to their father. Counsel also stated that the children had been with Cynthia for over three years, that they looked to Cynthia for assistance during visits with their parents, and that Cynthia provided them "a stable environment, in which they are thriving emotionally and physically."

Counsel for the Department acknowledged that Adrian was not able to visit the children while he was in prison, but argued that Adrian was incarcerated "due to his own actions" and that "the children can't be impacted by that at this point in the case." Counsel for the Department also argued that the children were adoptable, that they had a caring and stable relationship with Cynthia, and that Cynthia was open to allowing contact with Adrian even after adoption. For these reasons, counsel for the Department argued, the parental-benefit exception did not apply.

The juvenile court found that the children were adoptable, that no exception to adoption applied, and that returning the

children to their parents would be detrimental.  The court did not make specific findings regarding the parental-benefit exception at the hearing, but the minute order issued following the hearing stated:  (1) Adrian had not maintained regular visitation and had not established a bond with the children; (2) any benefit to the children from their relationship with Adrian was outweighed by the physical and emotional benefit the children would receive through the permanency and stability of adoption; and (3) adoption was in the best interest of the children.  The court terminated Adrian's (and Valarie's) parental rights and transferred care, custody, and control of the children to the Department for adoptive planning and placement.  The court designated Cynthia the prospective adoptive parent and found the permanent plan of adoption was preferable to legal guardianship because the children were "still available" to their parents "since they are with their maternal grandmother."  Adrian timely appealed.

## DISCUSSION

Adrian argues the juvenile court erred in ruling the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i), did not apply because, Adrian maintains, the Department's reports failed to properly address the children's bond with him and the court erred in considering whether the children would continue to have contact with Adrian after their adoption.  Adrian does not argue substantial evidence did not support the findings that he did not consistently visit the children and that the children did not have a substantial, positive, emotional attachment to him.

8

A.      *Applicable Law and Standard of Review*

The purpose of a hearing under section 366.26 is "'to select and implement a permanent plan for the child'" after the juvenile court has terminated reunification services.  (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*); see *In re C.P.* (2023) 91 Cal.App.5th 145, 153.)  If the court determines "the child is likely to be adopted," the court must "terminate parental rights to allow for adoption."  (*Caden C.*, at p. 630; see § 366.26, subd. (c)(1).)  "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan."  (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B), (4)(A).)  One of those reasons, the parental-benefit exception, requires the parent to establish by a preponderance of the evidence (1) "that she had 'regular visitation and contact with the child,' (2) 'that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship,' and (3) 'that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.'"  (*In re P.S.* (2024) 107 Cal.App.5th 541, 554; see § 366.26, subd. (c)(1)(B)(i); *Caden C.,* at p. 636; see also *In re V.S.* (2024) 104 Cal.App.5th 1154, 1168 ["'The party claiming that termination of parental rights would be detrimental to the child has the burden of proving the detriment.'"].)

"The first element—regular visitation and contact—is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court

9

orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632; accord, *In re A.L.* (2022) 73 Cal.App.5th 1131, 1151; see *In re I.R.* (2014) 226 Cal.App.4th 201, 212 ["Regular visitation exists where the parents visit consistently and to the extent permitted by court orders."].) "Visits and contact 'continue[ ] or develop[ ] a significant, positive, emotional attachment from child to parent.' [Citation.] Courts should consider in that light whether parents 'maintained regular visitation and contact with the child' [citation] but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here, as throughout, the focus is on the best interests of the child." (*Caden C.*, at p. 632; accord, *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1069-1070.) Thus, "the visitation element is to be understood in light of the overall purpose of the beneficial relationship exception." (*Eli B.*, at p. 1070.)

As stated, to establish the second element, "the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship." (*Caden C.*, *supra*, 11 Cal.5th at p. 636; see *In re J.D.* (2021) 70 Cal.App.5th 833, 852.) The "focus is the child," and "the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Caden C.*, at p. 632; see *J.D.*, at p. 854.) In assessing the attachment, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, at p. 632; see *J.D.*, at p. 854.)

10

"Concerning the third element—whether 'termination would be detrimental to the child due to' the relationship—the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.] What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633; see *In re I.E.* (2023) 91 Cal.App.5th 683, 692; *In re A.L.*, *supra*, 73 Cal.App.5th at p. 1151.) "A '"showing [that] the child would derive *some* benefit from continuing a relationship maintained during periods of visitation"' is not a sufficient ground to depart from the statutory preference for adoption." (*In re Andrew M.* (2024) 102 Cal.App.5th 803, 818; see *Caden C.*, at pp. 633-634.)

The juvenile court's ruling a parent has not satisfied his or her burden to establish the parental-benefit exception applies "'may be based on any or all of the [three] component determinations,'" including "'whether the parent has maintained regular visitation.'" (*In re A.G.* (2020) 58 Cal.App.5th 973, 996.) Indeed, "a parent must prove *all three* components of the beneficial relationship exception," and a "failure of proof on any one of them is fatal." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 322, fn. 10; see *In re Eli B.*, *supra*, 73 Cal.App.5th at p. 1068 [where the father did not meet his burden to prove he maintained regular visitation, the reviewing court need not consider the other elements of the parental-benefit exception].)

11

"We review the juvenile court's ruling on the first two elements for substantial evidence."[2] (*In re Eli B.*, *supra*, 73 Cal.App.5th at p. 1068; see *Caden C.*, *supra*, 11 Cal.5th at p. 639; *In re Andrew M.*, *supra*, 102 Cal.App.5th at p. 815.) "We review its ruling on the third element under a hybrid standard, reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*Eli B.*, at p. 1068; see *Caden C.*, at p. 640.) In reviewing factual determinations for substantial evidence, we do not "'reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'" (*Caden C.*, at p. 640.)

> B. *The Juvenile Court Did Not Err in Ruling the Parental-benefit Exception Did Not Apply*
>
> 1. *Substantial Evidence Supported the Juvenile Court's Implied Finding Adrian Failed To Regularly Visit Adrian III and Alana*

Adrian's only argument regarding the juvenile court's finding on visitation is that the juvenile court's minute orders

---

[2]    Citing *In re S.G.* (2021) 71 Cal.App.5th 654, the Department argues that, because the juvenile court found Adrian did not meet his burden of proof to demonstrate the parental-benefit exception applied, we should consider whether the evidence compels a finding in his favor as a matter of law. (See *id.* at p. 671.) The Department's argument has some analytical merit, but the Supreme Court has held the substantial evidence standard of review applies. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) In any event, Adrian cannot prevail under either standard.

stating he did not maintain regular visits with his children "sounded like boilerplate language." He does not, however, argue the court erred in failing to make different or more detailed findings at the hearing under section 366.26. The juvenile court's minute orders do include findings the court did not actually make and suggest the findings were added by the clerk from a template, a practice that undermines the integrity of the proceedings and is a disservice to the parties and to this court.[3] Yet, section 366.26 does not require a juvenile court to make specific findings to support a determination the parental-benefit exception does not apply. (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1156; see *In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1270, fn. 6 ["specific findings are not required absent a statute so requiring"].)

In any event, the record confirms Adrian did not consistently visit the children to the extent permitted by the court's orders (nine hours per week), even taking into account his periods of incarceration. The record shows Adrian's visitation was essentially nonexistent (1) before his first period of incarceration, when Cynthia refused to allow him in her house for two months and the Department made alternative arrangements with the paternal grandfather that Adrian did not pursue; (2) during his first period of incarceration for approximately seven months; and (3) during his second period of incarceration for approximately 13 months. Although Adrian testified he called

---

[3] We have previously criticized this practice, which is not confined to this judicial officer or courtroom at the Edelman Children's Courthouse. (See e.g., *In re T.G.* (2020) 58 Cal.App.5th 275, 298, fn. 20.) That it persists, and that no one appears to be listening, continues to be deeply troubling.

the children regularly from prison, the Department reported Adrian had no contact with the children during certain periods of his incarceration. Thus, even if Adrian had argued substantial evidence did not support the juvenile court's (implied) finding he did not consistently visit the children, substantial evidence supported that finding.

We appreciate Adrian's incarceration made it difficult for him to visit the children in person for almost 20 months. Adrian, however, does not argue the Department did not provide reasonable reunification services by failing to arrange appropriate visits during his incarceration. (See § 361.5, subd. (e)(1)(C) [reunification services for incarcerated parents may include "[v]isitation services, where appropriate"]; *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1014 [child protective agency must offer or provide reasonable reunification services to an incarcerated parent].) Indeed, the record shows Adrian did not respond to the Department's efforts to maintain monthly communication with him, at least during much of his first period of incarceration. Moreover, the juvenile court must consider whether the parent maintained regular visitation precisely because developing a significant, positive, emotional attachment from child to parent requires consistent visitation. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) Adrian III and Alana were very young when they were removed from Adrian. Adrian's absence from their lives for more than half the time the family received reunification services undoubtedly affected the children's ability to establish an emotional attachment with him.

>        2.     *Substantial Evidence Supported the Juvenile*
>               *Court's Implied Finding Adrian Failed To*
>               *Establish a Bond with Adrian III and Alana*

Even if Adrian's visitation when he was not incarcerated satisfied the first element of the *Caden C.* analysis, substantial evidence supported the juvenile court's implied finding Adrian did not have a substantial, positive, emotional bond with Adrian III and Alana.[4] According to the Department's reports, the children turned to Cynthia for affection, support, and assistance, despite Cynthia's efforts to direct the children to their parents. The Department stated in one report Adrian's long absences affected the children's ability to trust Adrian "to be there for them emotionally [and] physically." By the time of the selection and implementation hearing, Adrian III had spent almost half of his six and one-half years, and Alana had spent well over half of her life, with Cynthia. And although Adrian testified his children called him "Daddy" and cried when his visits with them ended, there was no evidence that the children experienced distress when visits ended (see *In re I.E.*, *supra*, 91 Cal.App.5th at p. 692 [evidence the child "experienced no distress at the end of visits" supported the juvenile court's finding "the relationship was not so substantial that its severance would be detrimental to the child"]) or that their relationship with Adrian was any different than that of an uncle or family friend (see *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 318

---

[4]     As he argued regarding visitation, Adrian argues the juvenile court made only the "boilerplate" finding he did not establish a bond with his children. As discussed, that is not a basis for reversing the juvenile court's orders terminating Adrian's parental rights.

["the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with [his or] her natural parent"]).

Adrian argues he presented evidence the children had a substantial, positive, emotional attachment to him. He cites his testimony that the children would "light up" and were "extremely happy" to see him when he visited; that he took them to the park and read, played, and did puzzles with them; and that he helped them with homework, completing school projects, eating breakfast, bathing, and getting ready for bed. Adrian also points to Cynthia's statements to the Department that the children benefited from Adrian's visits and were sad when he left. We do not review, however, whether Adrian presented sufficient evidence Adrian III and Alana had a strong, positive emotional attachment to him, but whether substantial evidence supported the juvenile court's implied finding they did not. (See *In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1195 ["[w]e do not inquire whether substantial evidence would have supported a different order"; we "ask only whether the juvenile court abused its discretion with respect to the order it made"]; *In re Eli B.*, *supra*, 73 Cal.App.5th at p. 1072 ["We must uphold the juvenile court's factual determination as long as it is supported by substantial evidence '"even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence."'"].) As discussed, substantial evidence supported that finding.

Adrian also faults the Department's reports for failing to adequately address Adrian III's and Alana's interactions and relationship with Adrian. Adrian, however, forfeited this argument by not making it in the juvenile court. (See *In re S.B.*

16

(2004) 32 Cal.4th 1287, 1293 ["a reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court"]; *In re G.C.* (2013) 216 Cal.App.4th 1391, 1399 ["father forfeited the right to complain that his parental rights had been terminated without an adequate selection and implementation report" because he did not object in the juvenile court].)

Adrian argues the Department's reports contained "very little information" about the quality of his relationship with the children. But Adrian, who had the burden at the selection and implementation hearing to prove Adrian III and Alana had a significant emotional attachment to him (see *Caden C.*, *supra*, 11 Cal.5th at p. 636; *In re Andrew M.*, *supra*, 102 Cal.App.5th at p. 815), provided only general information about his activities with Adrian III and Alana. He did not address the quality of his relationship with them, their emotional dependence (if any) on him, or the benefit (again, if any) to the children in continuing their relationship with him. (See *Caden C.*, at pp. 632, 636; see also *In re Katherine J.*, *supra*, 75 Cal.App.5th at p. 321 [father failed to show he had the requisite bond where he "adduced no expert testimony or current opinions (for example from social workers or therapists) who might have supported the strength of his relationship" with his child].) Substantial evidence supported the court's implied finding Adrian failed to meet his burden on the second element of the parental-benefit exception.

3. *The Juvenile Court Did Not Abuse Its Discretion in Concluding Adoption Outweighed Any Benefit from Continuing the Parental Relationship*

Finally, even if Adrian satisfied the first two elements of the *Caden C.* analysis, he does not argue and cannot show the juvenile court abused its discretion in concluding any benefit to the children from their relationship with him was outweighed by the physical and emotional benefit the children would receive through the permanency and stability of adoption. As discussed, although Adrian testified the children cried when his visits with them ended, there was no evidence that ending Adrian's relationship with the children would harm them. (See *In re Andrew M.*, *supra*, 102 Cal.App.5th at p. 819 [evidence a child "shared an affectionate connection" with his parents during visits and was sometimes reluctant to end the visits did not show a detrimental effect from terminating parental rights, where there was "no evidence that [the child] ever showed distress or was upset when separating from them"]; *In re I.E.*, *supra*, 91 Cal.App.5th at p. 692 [evidence a child "experienced no distress at the end of visits" supported the juvenile court's finding "the relationship was not so substantial that its severance would be detrimental to the child"].) To justify withholding the "security," "stability," and "'sense of belonging a new family would confer'" (*Caden C., supra*, 11 Cal.5th at p. 633), a parent "must prove more than "*some* benefit.""" (*Andrew M.*, at p. 820; see *In re G.H.* (2022) 84 Cal.App.5th 15, 25.) At a minimum, Adrian had to show some type of harm beyond the fact that enjoyable visits ended, and he failed to make such a showing. (*Andrew M.*, at p. 820.)

18

Moreover, there was ample evidence the children were emotionally bonded with Cynthia, wanted to continue living with her, and relied on her for emotional support and stability, which supported the court's implied finding adoption would not be detrimental to the children.  (See *In re I.E.*, *supra*, 91 Cal.App.5th at p. 693 [evidence the child was well adjusted in her placement, had a mutual attachment to her foster mother, and wanted to live with her prospective adoptive mother supported the finding terminating parental rights would not harm the child]; see also *In re Andrew M.*, *supra*, 102 Cal.App.5th at p. 818 ["It is only '[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, [that] termination would be "detrimental to the child due to" the child's beneficial relationship with a parent.'"].)

Adrian asserts the juvenile court, in determining under the third step of the *Caden C.* analysis whether adoption outweighed any benefit from the children's continued relationship with their father, erred in considering whether the children would continue to have contact with him after their adoption.  (See *In re J.D.*, *supra*, 70 Cal.App.5th at p. 866 ["the juvenile court must assume that if it decides to sever parental rights, then parent and child will be left as not just legal strangers to one another but also literal strangers"].)  The record does not support Adrian's assertion.  It was only after finding that the children were adoptable and that no exception to adoption applied that the juvenile court stated:  "The court finds the permanent plan of adoption is the permanent plan, versus the permanent plan of legal guardianship, is appropriate, since they are with their maternal grandmother, and the parents still have a connection to

19

their children, and the children are still available to them, [adoption] is ordered to continue as the permanent plan." The juvenile court did not consider whether Adrian would continue to see the children as part of its *Caden C.* analysis.

## DISPOSITION

The juvenile court's orders terminating Adrian's parental rights to Adrian III and Alana are affirmed.

SEGAL, Acting P. J.

We concur:

FEUER, J.

STONE, J.